Tyler Gardner #18175548
EOCI
2500 Westgate
Pendleton, OR 97801

FILED 23 AUG '21 10:46 USDC-ORP

Plaintiff pro se

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TYLER GARDNER; 1,700 JOHN DOES;
and all others similarly situated,

                    Plaintiffs,

vs.

KATE BROWN, Governor of Oregon; COLETTE
S. PETERS, Director of Oregon Department of
Corrections; OREGON HEALTH AUTHORITY
("OHA"); and 100 JOHN DOES; all named
defendants are sued in their individual and official
capacities,

                    Defendants.

Case No.    2:21-cv-01256-HZ

**CLASS ACTION ALLEGATION
COMPLAINT**

**Protected liability Action 28 U.S.C. § 1332**

**DEMAND FOR JURY TRIAL**

## I. JURISDICTION

1.    The Federal Court of Oregon has jurisdiction over Plaintiff's claims pursuant to 42 U.S.C. §

1983; 42 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3).

## II. VENUE

2.    The Federal Court of Portland Oregon is an appropriate venue under 28 U.S.C. § 1391(b)(2),

because a substantial part of the events or omissions given rise to Plaintiffs Constitutional claims

occurred in this district.

## III. PARTIES

3.    Plaintiff Tyler Gardner is a citizen of Oregon presently residing at Eastern Oregon Correctional

Institution (EOCI) 2500 Westgate, Pendleton Oregon 97801.

4.    Plaintiffs 1,700 John Does are Adults in Custody ("AIC"), and citizens of Oregon confined to

EOCI, 2500 Westgate, Pendleton Oregon 97801, under the care and custody of the Oregon Department

of Corrections.

5.    Defendant Kate Brown is a citizen of Oregon whose address is State Capitol Bldg., 900 Court

Street NE, Suite 254, Salem OR 97301. Brown is the Governor For Oregon and responsible for

faithfully executing the laws and Constitution of the State, and has the ability to issue executive orders

during emergencies. She is sued in his individual and official capacity.

6.    Defendant Colette Peters is a citizen of Oregon whose address is 2575 Center Street NE, Salem

Oregon 97301. Peters is responsible for overseeing the Oregon Department of Corrections, and creating

and enforcing policies. She is sued in his individual and official capacity.

7.    Defendant Oregon Heath Authority ("OHA") is the leading authority in Oregon responsible for

improving Oregonians health care issues. OHA is overseen by a nine-member citizen Oregon Health

Policy Board that makes policy and recommendations. Their address is 500 Summer St. NE,

E20,SalemOregon 97301-1097. They are sued in their individual and official capacity.

8.    Defendants 100 John Does are citizen of Oregon whose address are unknown at this time.

Plaintiffs will provide the names and addresses for each John Doe defendants after the completion of

discovery. Each John Doe is sued in his individual and official capacity.

9.    At all times, all named and unnamed Defendants acted under color of law during each of

Plaintiff's claims raised herein this Complaint being they each are employed by the State of Oregon.

## IV. CAUSE OF ACTION & SUPPORTING FACTS

A.    **FIRST CAUSE OF ACTION:** Defendants Kate Brown, Colette Peters, and 100 John Does,

placed Plaintiffs Tyler Gardner and 1,700 John Does ("Plaintiffs") at a substantial risk of serious harm

or possible death from the novel coronavirus (COVID-19), and COVID-19 variants: delta, delta-plus,

and lambda ("variants") by: (1) failing to construct plexiglas barriers around correctional staff stations,

and limiting contact and interaction between correctional staff and volunteers entering into the

institution; (2) confining AIC's for excessive period of time to poorly ventilated dormitories, small

cells, and day-room, without the means to practice social distancing; (3) failing to maintain adequate

medical and mental health facilities with qualified staff; (4) failing to treat COVID-19, and test for

COVID-19 antibodies; and (5) forcing mask wearing, all amounts to deliberate indifference in violation

of Plaintiffs Eighth Amendment rights to the United States Constitution.

**B.    SUPPORTING FACTS:**

### COVID-19 History & Mandates.

1.      COVID-19 is a respiratory disease and particularly dangerous due to how easily it spreads, and

can result in serious illness or death.

2.      The U.S. Center for Disease Control (CDC) reports that COVID-19 spreads mainly through

respiratory droplets produced when an infected person coughs, sneezes, or talks, and between

individuals in close contact with one another, and possibly when people touch contaminated surfaces

and then touch their mouth, nose, or eyes.

3.      On January 30, 2020, the World Health Organization ("WHO") declared that an outbreak of

COVID-19 was a Public Health Emergency of International Concern, and on March 11, 2020, declared

the outbreak a pandemic.

4.      On March 13, 2020, the President of the United States, Donald J. Trump, pronounced "the

ongoing Coronavirus Disease 2019 (COVID-19) pandemic is of sufficient severity and magnitude to

warrant an emergency declaration for all states, tribes, territories, and the District of Columbia,

pursuant to section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42

U.S.C. 5121 - 5207."

5.      On March 8, 2020, Governor Brown issued Executive Order 20-03 declaring a statewide

emergency pursuant to ORS 401.165 et seq. in response to the outbreak of COVID-19 in Oregon. The

state of emergency has been repeatedly extended.

6.      Governor Brown issued additional executive orders, that established restrictions on certain activities. These restrictions include limitations on the number of individuals allowed to congregate indoors, including at religious establishments.

7.      The CDC explained that anyone can have mild to severe symptoms, and can become severely ill, and may require hospitalization, intensive care, or a ventilator to help them breathe, or may even die.

8.      The CDC determined that some individuals appear to show no symptoms, while other individuals develop cough, shortness of breath or difficulty breathing, fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, or loss of taste or smell.

9.      Clinical evidence indicates that individuals who suffer severe symptoms, the virus may cause damage to organs such as the heart, liver, and kidneys, as well as to blood and immune systems.

10.     Clinical evidence indicates that individuals who suffer severe symptoms from COVID-19 may have damage to the walls and air sacs of their lungs, leaving debris in the lungs and causing the walls of lung capillaries to thicken so that they are less able to transfer oxygen going forward.

11.     Clinical studies have shown that individuals recovering from COVID-19, have indicated a declined lung function of 20% to 30%.

12.     The CDC has indicated that persons who are over the age of 65 and people of any age with certain underlying health conditions such as serious heart conditions, diabetes, chronic kidney disease, chronic obstructive pulmonary disease, obesity, and moderate to severe asthma are more conceivable to contract COVID -19.

13.     According to the CDC, NIH, and  Dr. Anthony Fauci, COVID-19 has mutated into more infectious strains, mainly delta, delta plus, and lambda, which are currently spreading rapidly across the

United States.

**(1)    Failing to Construct Plexiglas Barriers Around Correctional Staff Stations, and**

**Limiting Contact and Interaction Between Correctional Staff and Volunteers**

**Entering into the Institution.**

14.    Defendants Brown, Peters, and John Does suspended visitation at all ODOC institutions due to COVID-19, and installed plexiglas barriers in the EOCI visiting center to protect correctional staff and AIC from life threatening risk their visitors posed.

15.    When the plexiglas barriers were installed in the EOCI visiting room, visitors were not allowed to enter the institution, nor was the visiting room in use by AICs for any events.

16.    At the same time Defendants Brown, Peters, and John Does installed plexiglas barriers in the visiting-room, they did not install plexiglas barriers around correctional staff and volunteer work stations and have done nothing to limit Plaintiffs contact between correctional staff and volunteers rotating in and out of EOCI, when COVID-19 could only be introduced into EOCI through correctional staff and volunteers.

17.    Defendants Brown, Peters, and John Does were aware that many correctional staff and volunteers remain un-vaccinated, and pose a greater risk to Plaintiffs than their visitors,

18.    On June 30, 2021, Special Operations Captain, T. Stewart, limited AICs contact with family, while increasing the time Plaintiffs spent on housing units.

19.    When Defendants Brown, Peters, and John Does reopened visiting at EOCI on July 7, 2021, they imposed contact restrictions, mask mandates, no sharing food, and keep Plaintiffs and visitors behind plexiglas.

20.    Defendants Brown, Peters, and John Does closed visiting at EOCI on July 29, 2021, after three correctional officers were infected with one of COVID-19 variants, but they did not install plexiglas

barriers around correctional staff and volunteer work stations, or curve the frequent contact correctional staff and volunteers had with Plaintiffs.

21.    By Defendants Brown, Peters, and John Does, shutting down visitation between Plaintiffs and their visitors on July 29, 2021, for an increase of community spread of the COVID-19 variants, defendants were aware that correctional staff and volunteer continued to pose a greater risk to Plaintiffs absent installing plexiglas barriers around their work stations.

22.    The risk Plaintiffs face from being infected with COVID-19 or variants at EOCI, continues to be extremely high absent plexiglas barriers installed around correctional staff and volunteer work stations and limiting their contact with Plaintiffs.

23.    From the start of COVID-19 pandemic, to date of this complaint, defendants Brown, Peters, and John Does, forced Plaintiffs to work in tight crowded spaces under threat of segregation with non vaccinated AICs, correctional staff, and volunteers.

24.    Defendants Brown, Peters, and John Does have done nothing to prevent correctional staff and volunteers from mingling together indoor and outdoor with Plaintiffs in crowded areas: inside the dining hall, housing units, cells when conducting cell searches, and work station, i.e. laundry, multi building, education, kitchen, clothing room, receiving and departure, inmate labor detail, call-center, garment factory, maintenance, physical plant, welding and auto shops.

25.    If defendants Brown, Peters, and John Does, were to install plexiglas around correctional staff and volunteer work stations, and limit their contact with Plaintiffs, the risk factor would decrease in Plaintiffs being infected with COVID-19 or variants.

26.    Defendants Brown and Peters, and John Does, failure to build plexiglas barriers around correctional staff and volunteer work stations, resulted in Plaintiffs being exposed to and infected with COVID-19, and suffered (**state symptoms**).

  **(2)**  **AICs Confined for Excessive Period of Time to Poorly Ventilated Dormitories,**

     **Small Cells, and Day-Room, Without the Means to Practice Social Distancing.**

27. According to the WHO and CDC, COVID-19 and new variants, spread through droplet

transmission, and airborne transmission of viral particles, which can remain suspended and travel in the

air for hours.

28. The CDC advises that certain populations are at higher risk of contracting COVID-19 or

developing severe symptoms, including those in long-term care facilities, those with disabilities or

behavioral disorders, members of racial or ethnic minority groups.

29. In its guidance for correctional facilities, the CDC has explained that, among other things, the

crowded and fluid nature of detention facilities, the inadequate hygienic supplies, and the limited

options for medical isolation present unique challenges for control of COVID-19 transmission among

incarcerated persons, staff, and visitors.

30. The CDC Interim Guidance recommends correctional facilities practice social distancing,

ensure proper hygiene, extensive testing, cleaning and quarantining procedures to contain the spread of

COVID-19.

31. Clinical studies have shown that when persons are confined indoors for an extended period of

time, they are at a heightened risk of contracting COVID-19 or variants, whether they practice social

distancing at 6 feet, 30 feet or 60 feet.

32. Maintaining social distancing at 6 feet, let alone, 30 to 60 feet, is impossible for correctional

staff, volunteers, and Plaintiffs, to achieve at EOCI.

33. When the COVID-19 pandemic mandates were imposed by defendants Brown, OHA, Peters,

John Does, all outside activities were closed at EOCI, and Plaintiffs were confined to on unit activities,

and living areas.

34.     Defendants Brown, Peters, OHA, and John Does are aware that COVID-19 and variants, are more transmittable indoors and less transmittable outdoors, but continue to force Plaintiffs to crowd together in small cells, dormitories, bathroom, shower, day-rooms, work areas, when seeking medical care, and at medication distribution.

35.     The ventilation system at EOCI is archaic, and poses a heightened threat to Plaintiffs to be infected by COVID-19 or variants, due to unit dormitories, cells, and day-rooms having little airflow, air-ducks scarcely cleaned, filters seldom replaced, and the ventilation system breaking down.

36.     Plaintiffs share tablets, exercise equipment, telephones, and frequently touch surfaces throughout their shared living spaces, and form long tight lines to receive their food while in close contact with correctional staff and volunteers.

37.     EOCI is divided into the East-Side and West-Side, and Plaintiffs from each side, share work areas, education, religious service, and medical facility.

38.     The East-Side comprises of Units E2, E3, E4, F2, F3, F4, G3, and G4 are dormitories. Unit E2 through F4 house approximately 86 AICs. Units G3, and G4 house approximately 106 AICs. Unit G2 is open bar cells and houses approximately 86 AICs, and Unit H1 and H2 are cells, and houses approximately 86 AICs.

39.     In the dormitory units, Plaintiffs for the most part are confined to their living area, and when retiring for the night, they are housed closely next to other AICs, mainly in bunk-beds. AICs have 3-4 feet separation from the top and bottom bunk. There bunk-beds are separated from other AICs bunk-beds by 2-3 feet, sometimes less.

40.     The West-Side comprises of Units A1, A2, A3, A4, B1, B2, B3, B4, and C1, and consist of double cells, three man cells, and four man cells, and house approximately 86 AICs per unit. These cells are small, some requiring Plaintiffs to sleep head to head, offering no escape from COVID-19 or variants.

41.    There is a great number of vulnerable Plaintiffs living in close quarters, and have limited ability to physically practice social distancing, but Kate Brown, Colette Peters, and John Does have not promoted social distancing, or limited correctional staff and volunteers interactions with Plaintiffs.

42.    Defendants Brown, Peters, and John Does were aware that restricting Plaintiffs on housing units for extended periods of time in very poor ventilated spaces, defendants were subjecting them to a heightened risk of COVID-19 or variants, infection.

43.    Defendants Brown, Peters, and John Does have done little to reduce the prison population at EOCI, sleeping arrangement or taken the necessary steps to minimize the risk to Plaintiffs being exposed to COVID-19.

44.    Defendants Brown, Peters and John Does, are aware that without drastically reducing the number of AICs housed on each housing unit, population caps on each unit, Plaintiffs at EOCI and surrounding communities, are at grave risk of severe illness or death, from COVID-19 or variants.

45.    Defendants Brown, Peters and John Does, are aware that without upgrades in ventilation systems, along with frequent maintenance, Plaintiffs at EOCI and surrounding communities, are at grave risk of severe illness or death, from COVID-19 or variants infections.


     (3)     **Failing to Maintain Adequate Medical and Mental Health Facilities with Qualified Staff.**

46.    EOCI medical facility is located on D3, and comprise of: (1) one room adjacent to the chapel with 3 broom sized examination stations with no privacy; (2) blood draw area located in corner of records room adjacent to the x-ray and check-in areas; and (3) long-term care/infirmary with approximately 4 cells to house AICs that are severely ill or recovering from serious injury.

47.    EOCI does not have medical facility or employ enough qualified medial staff to care for the medical issues of Plaintiffs, which have resulted in delays and denials in medical treatment for serious

injuries, health issues, and COVID-19 or variants infection.

48.     EOCI does not have any on-sight doctors, forcing Plaintiffs to rely on non doctors to diagnosed illness, injuries, and prescribe treatment.

49.     Unit C1 was transformed into a housing unit to house AICs testing positive with COVID-19, or suspected having COVID-19, until then, Plaintiffs were quarantines in their housing units.

50.     Unit C1 is not medically staffed or fitted with medical equipment, or safety protocols to be classified as a medical unit.

51.     Defendants Brown and Peters and John Does have not taken the necessary steps to minimize the risk COVID-19 and variants pose to Plaintiffs by not operating a constitutional medical facility or employing qualified medical staff to contend with any future outbreak of COVID-19 or variants.

52.     There is no mental heath facility, clinicians, psychologists, or psychiatric doctors at EOCI to adequately treat Plaintiffs that suffer from mental health issues.

53.     The AICs that suffer from mental health issues are less likely to report possible COVID-19 exposure to correctional or mental health staff.

54.     These AICs that suffer from mental health issues are medicated and are more at risk to be infected with COVID-19 due to poor supervision, and less likely to follow CDC and OHA guidelines and mandates.

55.     Plaintiffs have suffered from psychological trauma-depression, despair, anxiety, fear, and have attempted suicide, due to defendants Brown and Peters and John Does Covid-19 restrictions of outside activities, visitation and communication with family and friends.

56.     Defendants Brown, Peters, and John Does failure to operate mental health facilities resulted in Plaintiffs inability to turn for help from qualified mental-health providers.

57.     Unit F2 is the designated mental health unit, but is not staffed by trained mental heath or correctional staff, and some mental health Plaintiffs are spread out among the other units.

    (4)     **Failing to Treat COVID 19, and Test for COVID-19 Antibodies.**

58.    The Food and Drug Administration ("FDA") approved therapeutics to ease the adverse effect of COVID-19, which Plaintiffs were prevented access to.

59.    Defendants Brown, Peters, OHA, and John Does, denied Plaintiffs therapeutics that could ease their suffering based on political ideology, and based on no scientific evidence that these therapeutics didn't work.

60.    Plaintiffs are prevented from seeking care in the form of therapeutics, and are under the sole medical care of defendants Brown, Peters, and John Does.

61.    Due to defendants Brown, Peters, OHA, and John Does, refusing to offer Plaintiffs therapeutics to help ease their suffering from COVID-19, Plaintiffs were reluctant to report symptoms of COVID-19 or variants, in fear of being isolated, punished, and suffer alone without any treatment.

62.    Many studies have shown that vaccinated immunity wains more than natural immunity, and many individuals that have natural immunity are 6 to 7 times protected from COVID-19 than those that have received the vaccination for COVID-19.

63.    Plaintiffs requested COVID-19 antibody testing from medical staff prior to the COVID-19 vaccines being available.

64.    Defendants  Brown, Peters, OHA, and John Does suppressing the scientific facts from Plaintiffs that those who have natural immunity could face elevated risk in adverse effects if they receive the COVID-19 vaccinations.

65.    Dr. Jay Bhattacharay, Stanford Professor of Medicine, and Dr. Harvey Rich, Yale Epidemiology Professor, have determined through clinical studies that individuals that have natural immunity, have just as much as, if not more, protection than those who have received the COVID-19 vaccinations.

66.    By defendants  Brown, Peters, OHA, and John Does, suppressing the benefits of natural immunity protections to push COVID-19 vaccinations, creates distrust in the government, and is illogical and immoral.

67.    Defendants  Brown, Peters, OHA, and John Does should have factored in natural immunity

when addressing Plaintiffs that are under consideration of COVID-19 vaccinations.

68.    Defendants Brown, Peters, OHA, and John Does are concealing the truth when claiming that

vaccinated individuals are protected from COVID-19, but neglect to state the scientific fact that those

individuals that have contracted COVID-19 are protected just as much, if not more, as the vaccinated

are from COVID-19.

69.    If Plaintiffs had received the test for the COVID-19 antibodies, and it was determined they had

natural immunity, many Plaintiffs would have chosen not to receive the vaccine.

70.    After receiving the vaccine, many Plaintiffs suffered from: (1) pressure on the heart and chest,

(2) shortness of breath, (3) difficulty breathing, (4) headaches, (5) crowded thinking and thought

processing, (6) memory loss, (7) loss of motor function, and (8) chronic pain.

71    By defendants Brown, Peters, OHA, and John Does, preventing Plaintiffs from being tested for

the COVID-19 antibodies, Plaintiffs could not make an informed decision on receiving the vaccine.

72.    Defendants Brown, Peters, and John Does, were deliberate indifference to Plaintiffs health and

safety by failing to protect them from COVID-19 through social distancing, testing for antibodies,

medical treatment, and forced vaccinations.

       **(5)    Forcing Mask Wearing.**

73.    Defendants Brown, Peters, OHA, and John Does consider protective face-coverings to means a

cloth, polypropylene, paper or other covering that covers the nose and the mouth and that rests snugly

above the nose, below the mouth, and on the sides of the face.

74.    Defendants Brown, Peters, OHA, and John Does, mask mandates are scientifically proven false.

75.    Study in 2015 demonstrated the CDC was aware masks increase risk of infection, and had a six

percent rise in carbon dioxide in the blood of individuals wearing masks.

76.    Carboxyhemoglobin refers to hemoglobin bound to carbon dioxide instead of oxygen.

Carboxyhemoglobinemia, the presence of carboxyhemoglobin in the blood, is associated with carbon

monoxide poisoning, and can be associated with injury or toxic agents and can cause cyanosis and

headache as well as dizziness, fatigue, ataxia, dyspnea, tachycardia, nausea, vomiting, and drowsiness. It can lead to coma and sometimes death.

77.     Defendants Brown, Peters, and John Does, have blocked and discouraged providing masks exceptions to Plaintiffs with per-diagnosed medical conditions or complications caused by COVID-19 or COVID-19 vaccines, that wearing masks would elevate.

78.     Defendants Brown, Peters, OHA, and John Does mask mandates pose a greater risk to Plaintiffs in contracting COVID-19 due to the high number of times they touch their mouth, nose, eyes and face, when having to adjust and remove their masks after touching contaminated areas, or coming in contact with correctional staff and volunteers.

79.     Defendants Brown, Peters,OHA and John Does mask mandates poses a serious risk to Plaintiffs being infected with COVID-19 or variants, or additional infectious disease.

80.     Defendants Brown, Peters, OHA and John Does mask mandate caused Plaintiffs to be afflicted with depression, anxiety, fear, mental and emotional breakdowns, suicide attempts and continuations, and other psychological trauma.

81.     Defendants  Brown, Peters, OHA, and John Does, mask mandates have prevented some Plaintiffs from wearing prescription glasses due to the mask causing them to cloud-up, impairing their vision.

82.     Defendants  Brown, Peters, OHA, and John Does, have provided Plaintiffs with  ineffective masks, which they are aware do not provide any protection from COVID-19 or variants infections.

83.     The type of masks correctional staff and volunteers are wearing, do not protect Plaintiffs from being infected with COVID-19, or variants, and are seldom exchanged.

84.     The long-term effects of wearing masks have not been studied, and defendants Brown, Peters, OHA, and John Does, mask mandates could cause long-term damage, or injury, i.e. heart-attach or stroke.

85.    COVID-19 can cause difficulty in breathing, and wearing masks makes it more difficult to breathe, and defendants Brown, Peters, OHA, and John Does, forcing Plaintiffs to wear masks, amounts to torture.

86.    Defendants Defendants Brown, Peters, OHA and John Does mask mandate is causing Plaintiffs to suffer from oxygen deprivation, lack of oxygen to brain, causing light headed, muscles, altered blood platelets, and pressure on heart.

87.    Studies show masks are more detrimental to your health than protection from COVID-19 infection

88.    Defendants Brown, Peters, OHA and John Does mask mandates poses a serious risk to plaintiffs Gardner and john does being infected with COVID-19 and or COVID-19 variants.

89.    Defendants Brown, Peters, OHA and John Does mask mandate caused Plaintiffs to be inflicted with depression, anxiety, fear and other psychological trauma.

**A.**    **SECOND CAUSE OF ACTION:** Defendants Kate Brown, Colette Peters, OHA, and 100 John Does violated Plaintiffs Tyler Gardner and 1,700 John Does equal protection rights under the Fourteenth Amendment to the United States Constitution, when forcing mask mandates on incarcerated vaccinated individuals, while excluding non-incarcerated vaccinated individuals from the mask mandates.

**B.**    **SUPPORTING FACTS:**

90.    On April 19, 2021, COVID-19 vaccines were made available to all Oregonians age 16 and over, and Plaintiffs were notified they were eligible to receive COVID-19 vaccination in February 2021.

91.    Approximately 90 percent of EOCI AIC population received the two shot Moderna vaccination.

92.    Plaintiffs opted to receive the Moderna vaccination under the prelude defendants Brown, Peters, and John Does would restore: (1) daily activities at ODOC prisons would return to normal operations; (2) visitation would resume, (3) it would not effect any application for early release; and (4) no mask

mandates.

93.    After Plaintiffs received the vaccination, defendants Brown, Peters, and John Does did not

return ODOC institutions to normal operation.

94.    Current CDC guidance states that COVID-19 vaccines are effective at protecting individuals

from getting sick, and that fully vaccinated individuals can resume activities without wearing a mask or

social distancing.

95.    On May 13, 2021, the CDC and OHA issued new guidance for lifting mask and social

distancing requirements for fully vaccinated individuals.

96.    On May 14, 2021 Defendant Brown lifted the mask mandate on vaccinated individuals

providing that Oregonians who are fully vaccinated no longer need to wear masks or social distance in

most public spaces. Defendant Brown did not lift the mask mandate or social distancing requirements

for correctional facilities.

97.    On July 7, 2021, defendant Brown lifted most COVID-19 health and safety restrictions, stating

the State does not require masks and face coverings in most settings, excluding correctional settings.

98.    Defendants Brown, Peters, and John Does excluded correction facilities from the CDC's and

OHS mask guidance, are sending mix messaging as it relates to vaccinated individuals.

99.    Defendants Brown, Peters, and John Does Plaintiffs are unequally and discriminatory subjecting

Plaintiffs to comply with mask mandates when excluding non-incarcerated individuals from the mask

mandates.

A.    **THIRD CAUSE OF ACTION:** Defendants Kate Brown, Colette Peters, and 100 John Does

violated Plaintiffs Tyler Gardner and 1,700 John Does Free Exercise of Religion Clause of the First

Amendment rights to the United States Constitution, and the Religious Land and Institutionalized

Person Act, when terminating all religious services and practices for over one year.

**B.   SUPPORTING FACTS:**

100.   Defendants Brown, Peters, and John Does discontinued all religious services at EOCI, denying Plaintiffs access to any religious services, for over one year due to COVID-19.

101.    For over one year, Defendants Brown, Peters, and John Does, denied Plaintiffs access to: (1) worship in their prospective religions; (2) partake in their religions beliefs or customs; (3) participate in any bible studies, congregation, communion; and (4) substitute an AIC to preach or conduct religious services or programs.

102.    For over one year, defendants Kate Brown, Colette Peters, and John Does, have placed a substantial burden upon Plaintiffs ability to practice their religious beliefs, and in seeking out spiritual guidance from their prospective religious leaders of all faiths and beliefs.

103.    For over one year, defendants Kate Brown, Colette Peters, and John Does, have allowed for non religious programs to operate at EOCI, with volunteers and prisoner facilitators.

104.    Due to defendants  over one year, defendants Kate Brown, Colette Peters, and John Does, banning all religious practices, services, and gatherings for over one year, Plaintiffs have suffered from depression, waning of faith, deprivation of spiritual guidance, part of a congregation, expand their religious teachings, engage ministers, communion, and practice in their religion.

105.    Defendants Kate Brown, Colette Peters, and John Does, have not taken the least restrictive means when issuing an all out ban on religious services, programs, and gatherings.

**A.      FOURTH CAUSE OF ACTION:** Defendants Kate Brown, Colette Peters, OHA, and 100 John Does imposed mask mandate, amounts to government overreach, in violation of Plaintiffs Tyler Gardner and 1,700 John Does right to be free of government intrusion protected under the Fourteenth Amendment rights to the United States Constitution.

**B.   SUPPORTING FACTS:**

106.    From the beginning of the COVID-19 outbreak, the NIH, CDC, and Dr. Anthony Fauci, director

of the National Institute of Allergy and Infectious Diseases, and one of the lead members of the White House Coronavirus Task Force during President Trump's administration, and current Chief Medical Adviser for President Joe Biden, proclaimed to the American public that he did not recommend wearing masks.

107.    The CDC, NIH, Dr. Fauci, and United States Surgeon General, repeatedly stressed that face coverings would not prevent the spread of COVID-19.

108.    On April 3, 2020, Dr. Anthony Fauci, stated that some sort of covering doesn't work.

109.    On April 3, 2020, the CDC and Dr. Fauci reversed their previous guidance that urged people not to wear masks, to recommending the use of face masks to combat the spread of COVID-19.

110.    Dozens of scientific studies by medical institutions and experts concerning the effectiveness of masks, have reached a consensus that masks do not prevent the spread of COVID-19, due to the micro size of COVID-19 and variants being able to escape masks.

111.    Surgeon General Jerome Adams stated that masks were not effective in preventing the general public from catching COVID-19.

112.    In July 2021, President Joe Biden's COVID-19 adviser, Dr. Michael Osterholm, declared that most type of cloth masks and other face-coverings being worn do not protect from COVID-19 infection or spread.

113.    Dr. Daniel Stoke, joined in the scientific findings that "coronavirus particles are small enough to go through masks."

114.    Mask mandates are cosmetic theater, and offers false security, and leads to more COVID-10 and variants infections.

115.    Defendants Brown, Peters, OHA, and John Does, have not conducted any mask studies related to whether masks help prevent the spread of COVID-19, or longer-term adverse effects in wearing masks.

116.    41 billion dollars have been allocated to the NIH for COVID-19 matters, but only 0.4 of the 41

billion dollars have been used for COVID-19 research, non of which was used to conduct studies on

whether masks help prevent the spread of COVID-19.

117.    Among health and science professionals, CDC, and NIH, cloth face coverings are not the same

as medical N95 respirators, and healthcare personnel and first responders should not wear cloth face

coverings instead of PPE.

118.    There is no longer any real question as to the usefulness of face masks, even when properly

used, to prevent flu transmission from an infected person, and have not prevented the present spikes in

COVID-19 cases.

119.    Defendants Brown, Peters, and John Does can offer no evidence from any clinical study to

contradict the facts and conclusions made by multiple clinical studies that determined mask don't

prevent the spread of COVID-19.

120.    The present COVID-19 infection statistics at the end of 2020 greatly exceed those at or before

the dates when mask mandates were issued, the use of masks and mask mandates have not decreased

the overall health risk of the COVID-19 pandemic.

121.    A FOIA request was made for the CDC to produce any study they performed on how masks

helped prevent the spread of COVID-19, which they responded the CDC has conducted no such studies

on masks related to whether they help prevent the spread of COVID-19.

123.    Mask mandates infringe upon Plaintiffs right to breathe oxygen without restriction, and have

long-term consequences.

124.    The mask mandates are authoritarianism, are an irrational response to COVID-19, and hostile to

the inherent right of every person to care for their own body.

125.    The Association of American Physicians & Surgeons opposed masks, stating "we're suppose to

follow evidence-based medicine these days, but there is no firm evidence to support the masking and

social distancing mandates being imposed throughout the land." See https//aapsonline.org/covid-mask-distancing-not-evidence-based/.

126.    Plaintiffs are threatened with disciplinary actions, cell ins, and segregation if not properly wearing their masks, but have not been shown to properly wear masks by defendants  Brown, Peters, OHA, and John Does, and have been mislead by posted directions in conflict with correctional staff and volunteers.

127.    The right to breathe oxygen without restriction is a fundamental right deeply rooted in our history and traditions and fundamental to our concept of constitutionally ordered liberty.

128.    Plaintiffs assert that the mask mandates are not neutral laws of general applicability and there is no rational relationship between a legitimate governmental purpose, and have not been a rational response to protecting peoples health and preventing the spread of COVID-19.

129.    On January 29, 2021, Dr, Fauci stated that two masks were needed to prevent the spread of COVID-19.

**A.**    **FIFTH CAUSE OF ACTION:** Defendants Kate Brown, Colette Peters, OHA, and 100 John Does, enforcement of mask mandates violated Plaintiffs and 1,700 John Does right to be free from religious, viewpoint, and political discrimination, protected under the freedom of religious exercise of the First Amendment, and equal protection rights under the Fourteenth Amendment to the United States Constitution.

**B.**    **SUPPORTING FACTS:**

130.    Defendants Kate Brown, Colette Peters, and John Does, mask mandates are not grounded in any science and was birthed from political posturing to publicly shame by portraying democrats as more virtuous and moralistic than republicans.

131.    Democrat officials have stated publicly that "masks are the only outwardly visible signal that you are contributing to the solution, and that masks are also a sign of respect.

132.    Defendants Kate Brown, Colette Peters, and John Does, mask mandates amounts to political and viewpoint discrimination, and has become a practiced religion.

133.    Defendants Brown, Peters, OHA, and John Does are allowing politicians, teacher unions, news outlets, social media, and big tech, to drive non science based mask policies to force Plaintiffs to succumb to their viewpoint, and political aspirations to maintain control over Plaintiffs through fear-mongering.

134.    Defendants Brown, Peters, OHA, and John Does forced Plaintiffs to wear masks when they and other Democrat leaders only wore masks and practiced social distancing when in view of the public, but crowded in hallways and rooms without masks and no social distancing, embracing each other, and shaking hands.

135.    Defendants Kate Brown, Colette Peters, John Does, and Democrats claimed that the tens of thousands of anti fa and black lives matter protesters, gathering in crowds without wearing masks or social distancing, was righteously justified, while condemned tens of thousands of President Trump supporters gathered at rallies without wearing masks and social distancing, as evil and murders.

136.    Defendants Kate Brown, Colette Peters, and John Does are forcing political ideology upon plaintiffs, and amounts to political indoctrination into their moralistic and value beliefs..

137.    The COVID-19 pandemic does not allow defendants Brown, Peters, OHA, and John Does to suspend the rights plaintiffs have under to Constitution.

138.    First Amendment categorically prohibits government attempts to influence or impose unwanted ministers on religious groups.

139.    Defendants Brown, Peters, OHA, and John Does, have launched a campaign of fear, along with other democrats, whereas the Department of Homeland Security lists the number 1 terror threat to the United States of America, is "Opposition to Covid Measures".

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tyler Gardner respectfully prays that this Court:

1.    Enter judgment in favor of Plaintiff for compensatory and punitive damages, as allowed by law, against each Defendant, jointly and severally, for the amount of fifty 100 million dollars and to be determined by a jury.

2.    Enter permanent injunction against defendants, their agents, and successors, ordering defendants to build a medical and mental health facility at EOCI.

3.    Enter permanent injunction against defendants, their agents, and successors, ordering defendants to hire enough qualified medical and mental health staff to care for Plaintiffs housed at EOCI.

4.    Enter permanent injunction against defendants, their agents, and successors, ordering defendants to place a population cap on each housing unit at EOCI to maintain social distancing requirements.

5.    Enter any such additional relief that the Court deems just and proper.


RESPECTFULLY Submitted this 19th day of August, 2021.

_____
Tyler Gardner




## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that Tyler Gardner, Plaintiff in the above entitled action, that the information contained in the complaint is true and correct to the best of his belief and pursuant to 28 U.S.C. § 1746.

Tyler Gardner

8/19/21

Date